# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00589-SCT

*AARON MITCHELL a/k/a AARON JAMES LEWIS MITCHELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/2021 |
| TRIAL JUDGE: | HON. LEE SORRELS COLEMAN |
| TRIAL COURT ATTORNEYS: | SCOTT WINSTON COLOM |
| | COLLEN LEIGH HUDSON |
| | RODNEY A. RAY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RODNEY A. RAY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  ALLISON ELIZABETH HORNE |
| |      ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/06/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Aaron Mitchell shot and killed Marty Moore.  Evidence indicates that Moore was the initial aggressor, and Mitchell argues that he shot Moore in self-defense.  Mitchell moved for the State to produce the autopsy report for Moore's body.  When it became clear that an autopsy report was not forthcoming because an autopsy had not been completed, Mitchell moved for an autopsy to be conducted, and the trial court denied his motion.  The State's

representations on whether a partial or preliminary autopsy was performed are unclear and contradictory. Mitchell argues that the lack of autopsy violated his due process right to present a complete defense. Because the record does not contain sufficient information for this Court to make a determination that reversible error was committed, we affirm Mitchell's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2. While trial testimony differed, the basic facts are not in dispute. On the night of August 6 and into the early morning of August 7, 2019, Marty Moore, Aaron Mitchell, Kevin Webster, Xavier Martin, Cedric Cotton, Jada Lyons, and Jasmine Jennings were socializing outside of Lyons's home in Sandfield in Columbus, Mississippi. Several people were drinking from an E&J bottle. At some point in the night, a man in his fifties, Eddie McGregory, who was known to the group as "Old School," pulled up. Moore began to get aggressive with McGregory, and Mitchell told Moore to stop. McGregory left, and Moore turned his aggression on Mitchell. Mitchell attempted to leave twice, and Moore stopped him. Moore continued to verbally threaten Mitchell. Mitchell got his gun out of his vehicle and shot Moore several times. Moore was pronounced dead at the hospital shortly thereafter. Mitchell turned himself in to the police that night. Mitchell admitted shooting Moore, but he claimed that he did so in self-defense. Mitchell was indicted for first-degree murder.

¶3. On February 2, 2021, Mitchell filed a Motion to Compel Autopsy Report, arguing that the autopsy report was necessary to his defense theories. The State responded that the state medical examiner had a significant backlog of autopsies, including Moore's. The State

represented that "[a]s of February 2, 2021, the State Medical Examiner has not even conducted a preliminary autopsy in the death of Marty Moore." Thus, the State argued it did not have an autopsy report to produce. In response, Mitchell filed a Motion for an Autopsy. He argued that an autopsy would determine "the distance of the gunshot which putatively ended the life of Moore, the presence of burns and stippling around the wound on the decedent's body[,] [t]he angle that the projectile struck the victim and the course of the projectile through the body . . . ." Mitchell maintained that this information would assist his defense. The motion was heard in a telephonic hearing. The appellate record does not contain a transcript of the hearing. The trial court denied the motion "because an autopsy has not been performed" and would require "the exhumation of the Decedent's body[,]" which would be "an undue burden on the State of Mississippi as well as the family of the Decedent."

¶4. The trial was held in May 2021. The State called several eyewitnesses to the shooting. Kevin Webster, a friend of Moore's who arrived at the gathering with Moore, testified that there were no problems at the gathering until McGregory arrived. Moore and McGregory had a confrontation. Mitchell then got involved, verbally defending McGregory from Moore. Webster testified that "Marty [Moore] was more aggressive . . . ." He further stated that "Marty [Moore] was doing the aggressor." He stated that Mitchell tried to get to his car, "but Marty [Moore] wouldn't let him get in his car . . . ." Webster asserted that everyone was trying to calm Moore down and that someone grabbed Moore's arm and distracted him. At that point, Mitchell grabbed his gun and warned Moore that he would shoot him. Moore

3

replied "about six times, I'm gon beat yo - - you know what I'm saying?" Webster clarified that when Mitchell grabbed his gun, Moore said to Mitchell "on the boss six times, I'm fixing to beat your [ass]." Then, Mitchell shot Moore several times. Webster testified that Moore did not have anything in his hands when Mitchell shot him. He stated that the first shot missed, and then the second shot hit Moore in the back, Moore spun around, and Mitchell shot him in the front.

¶5.  Xavier Martin, a cousin of Mitchell's, also witnessed the shooting on August 7, 2019. Martin testified that when McGregory arrived, Moore got "very rude" with McGregory, calling him "bitches," threatening to beat up McGregory and his son, and telling him to leave; McGregory then left. Mitchell then told Moore that he was wrong for how he treated McGregory. Mitchell and Moore began arguing, and Mitchell attempted to get into his car to leave twice, but Moore would not allow him to do so. Mitchell also told Moore to leave him alone. Martin testified that it appeared that Mitchell and Moore were about to fight when Mitchell retrieved a gun from his car. Martin did not see anything in Moore's hand. Mitchell told Moore to leave him alone, and then Mitchell shot Moore several times. When Mitchell shot Moore, Moore was advancing toward Mitchell and calling him names. Martin also testified that he was afraid of Moore. He further testified that Moore was drunk and had also done cocaine that night.

¶6.  Jada Lyons also testified about the events of that night. Lyons had gone inside for about two minutes. Lyons testified that she heard Moore ask someone to hold his bottle and that shots were then fired. She testified that no other car pulled up and that she did not see

4

McGregory. She further testified that Moore never threatened Mitchell.

¶7. Jasmine Jennings also testified about the shooting. Both Moore and Cotton were romantically pursuing Jennings on August 7, 2019. She testified that Mitchell and Moore were having a conversation, and it suddenly became louder. She did not notice any reason why it may have become louder. She did not see McGregory or another vehicle, and she did not hear anyone say anything of significance before she heard gunshots. She saw Mitchell shoot Moore. Jennings testified that Moore was holding an E&J bottle in his hand when he was shot. Then she changed her testimony and stated that Moore did not have anything in his hand when he was shot. She further testified that Moore was standing still when Mitchell shot him.

¶8. Cedric Cotton, Mitchell's friend and Martin's cousin, testified for the State as a hostile witness. Cotton stated that Moore and McGregory had a conflict because Mitchell told Moore that he was being disrespectful to McGregory. Moore and Mitchell got into an argument, and Moore stopped Mitchell from leaving. Cotton attempted to defuse the altercation, and Moore knocked his arm away. He testified that Moore was ready to fight with Mitchell, but he did not have anything in his hands at the time. He further heard Moore say "on the boss six times, I'm gonna whoop your ass." Cotton also testified that Moore was "an aggressor" and that he had been in a physical fight with Moore previously.

¶9. Lowndes County Sherriff's Deputy Raymond Cyr, who was with the Columbus Police Department at the time of the shooting, responded to the scene of the shooting. He testified that he could not find a pulse for Moore and that he could see gunshot wounds, but that he

5

and his sergeant began CPR anyway. As they did compressions, blood came out of the wounds, and they stopped CPR. Cyr searched the ground and saw some shell casings, but nothing else. At some point, they packed the wounds with gauze, and the paramedics arrived and used a defibrillator. Cyr testified that Moore was not moving or breathing. In Cyr's opinion, Moore was dead. The State further entered Cyr's bodycam video, which showed the scene as he had testified, into evidence.

¶10. Officer John Compton with the Columbus Police Department also responded to the scene. He saw Moore with multiple gunshot wounds and saw that blood started coming out of his wounds when other officers were administering chest compressions. He could not find Moore's pulse and said Moore was not moving. In Compton's opinion, Moore was dead. Compton walked around the scene and found several shell casings. He did not find anything else at the crime scene.

¶11. Officer Rachel McCord with the Columbus Police Department was also dispatched to the scene. She testified that Moore was not moving or breathing when she arrived, and she believed him to be dead. After she helped tape off the scene, McCord went back to the police department. As she was pulling in, she observed another car pulling in and three men asked her if someone had just been killed. She responded in the affirmative, and Mitchell turned himself in. He confessed to being the shooter, and informed McCord that he shot Moore in self-defense. Mitchell was very cooperative, turning in the gun and willingly placing his hands behind his back for handcuffing. McCord's bodycam video depicting the scene and a portion of the time at the police department was entered into evidence.

¶12.    Hunter Mooney, a forensic scientist with the Columbus Forensics Lab, processed the crime scene. Police officers had placed thirteen evidence markers at the scene. Mooney processed several red stains. He also collected copper jacketings (shell casings), which were sent to the state crime lab. Through Mooney, the State introduced the location at the scene where each shell casing was found. He collected a total of six shell casings. Mooney also recovered two projectiles. Mooney testified that he did not recover an E&J bottle or any weapons from the scene.

¶13.    Sergeant Eric Lewis with the Columbus Police Department responded to the scene, as well. When he arrived, Moore was already in an ambulance. Lewis began investigating the case, identifying witnesses and later going to the hospital. He took the witness statements of Cotton, Martin, and Webster, and he reviewed the statements of Lyons and Jennings taken by other officers. He also interviewed Mitchell, who told Lewis that he shot Moore in self-defense. Lewis stated that the common theme among all the witness statements was that Moore was the aggressor.

¶14.    Mark Boackle, a firearms examiner with the Mississippi Forensics Lab, testified that most of the projectiles retrieved from Moore's body and the cartridges retrieved from the scene were exact or partial matches to the gun that was submitted by the Columbus Police Department. The projectiles determined to be only partial matches were too small to determine if they were exact matches.

¶15.    Dr. Harry Richardson, the emergency room physician who treated Moore, testified that Moore appeared to be deceased when he arrived at the ER. Dr. Richardson also testified that

7

the gunshot wounds suffered by Moore were the cause of his death.

¶16. In his defense, Mitchell called McGregory to testify. McGregory testified that he was in Sandfield on the night of August 7, 2019, and as soon as he arrived and saw several people in the street, Moore approached him aggressively and threatened him. He testified that Mitchell got in between him and Moore, and McGregory then got in his car and left.

¶17. Mitchell then testified in his own defense. He testified that on August 7, 2019, he gave Martin and Cotton a ride to Sandfield. He testified that the three of them were socializing with Lyons and Jennings, and then Moore and Webster arrived. They were all drinking and socializing without problems, although Mitchell testified that he did not drink much. He testified that McGregory pulled up, and Moore ran across the road aggressively and threatened McGregory. Mitchell stepped in between Moore and McGregory. McGregory then left. Mitchell testified that Moore then kept following Mitchell, while Mitchell tried to avoid Moore.

¶18. Mitchell noted that Moore had had altercations with several people that night, including McGregory, Jennings, and Cotton. And then Moore had a conflict with Mitchell, as Mitchell continuously attempted to get in his car to leave and Moore kept following him. At one point, Cotton attempted to stop Moore, and Moore pushed him out of the way. The last time that Mitchell attempted to get in his car to leave, Moore attempted to get into the passenger's seat of Mitchell's car. Mitchell then testified that Moore said, "On the boss six times, I'm gone whoop your ass." Mitchell kept telling Moore to get back. Cotton tried to hold Moore back, and then Moore went after Mitchell again, this time with a bottle in his

8

hand.  Mitchell then grabbed his registered gun, aimed it at Moore, and told him to get back. Moore stated that he was not scared and had been shot before.  Moore rushed at Mitchell and Mitchell shot at the ground as a warning shot, but Moore kept rushing him, so he shot at Moore.

¶19.    Mitchell further testified that when Moore was rushing him, Mitchell knew that Moore had assaulted several people, knew that Moore was facing kidnapping charges, and knew that Moore had a reputation for violence and being on drugs.  After the shooting, Mitchell left, and thirty-five to forty minutes afterward, turned himself in to the Columbus Police Department.  Mitchell also noted that he has chronic bronchitis and cannot physically fight someone off.

¶20.    At trial, the issue of an autopsy and its attendant report was raised multiple times. First, it arose when the State attempted to introduce into evidence police officer body camera footage that showed Moore dying.  The State argued that the inflammatory video was necessary to show the jury because it was having "to go through circumstantial evidence that he died from gunshot wounds . . . ."  Mitchell's counsel argued that "[t]his is exactly why an autopsy is necessary in these type cases because now we're going to have a man gurgling - - it's just awful to watch and it's going to inflame the jury so . . . ."  The Court allowed the video into evidence.

¶21.    Second, when cross-examining Sergeant Lewis, Mitchell's counsel questioned him as to whether he looked into powder burns on Moore.  Sergeant Lewis testified that he did not, and that the medical examiner would usually look at issues like that in the autopsy.

Sergeant Lewis testified that the distance between the shooter and the person shot can help give hints as to what occurred. The State objected to the line of questioning because it believed that Mitchell was attempting to establish that an autopsy should have been done. The trial court overruled the objection. Sergeant Lewis admitted that the presence or absence of powder burns and varying sizes of bullet holes in the body can help solve a case. Sergeant Lewis also testified that he had information that Moore was intoxicated and on cocaine on the night of August 7, 2019, and that an autopsy would have shown whether Moore was under the influence of any alcohol or drugs and the extent to which they were in his system. The State then asked Sergeant Lewis if he had any information that Moore was having health problems prior to being shot, and Sergeant Lewis replied in the negative. Mitchell objected, noting that the State asking these questions was inappropriate because it did not have an autopsy. The following colloquy regarding the autopsy occurred:

BY THE COURT: I think it's relevant to show why he didn't think it was necessary to send the body down for an autopsy.

BY MR. COLOM: The body was sent down.

BY MR. RAY: It was sent, Your Honor. He can't - - I mean, I know - - it was sent. He just didn't know that it wasn't finished because of something that none of us have control over.

BY THE COURT: I'm not aware of that fact either. Y'all know something I don't.

BY MR. COLOM: About what?

BY THE COURT: About whether or not there was an autopsy and whether or not - -

BY MR. COLOM: It was done initially by Dr. LeVaughn.

10

. . . .

BY MR. COLOM:  Dr. LeVaughn suddenly retired without doing the report for his autopsy so the State - -

BY THE COURT:  See, that's something I wasn't aware of.

BY MR. COLOM:  Well, you may have forgotten.  He filed a motion for autopsy.

. . . .

BY MR. COLOM:  And that's why we said we couldn't do it because we would have had to exhume the body to have somebody else do it.

BY MR. RAY:  That's when we had that telephonic conference.

Further, the State clarified that Mitchell's attorney was "trying to make a point that you sent the blood, sent the gun down, but you didn't - - didn't send the body down to get an autopsy, which, of course, we did and - - but we don't have the autopsy.  We don't have the report."

¶22.  In the cross-examination of Dr. Richardson, Mitchell attempted to address whether an autopsy could have helped determine the distance from which Moore was shot and the State objected.  Mitchell argued it was relevant to the self-defense claim, and noted that he was not arguing about the cause of death, but that the autopsy would have given other evidence regarding the situation.  But then, after having stated that no autopsy report existed, the State represented to the trial court that "the preliminary autopsy showed that [Moore] didn't have cocaine in his system . . . . I'm not going to get into it because, you know, there was methamphetamine, but I just think that he's got this issue for appeal."  So, evidently, some preliminary autopsy report *was* created, but it was not placed in the record, and the

11

record does not indicate whether Mitchell had received this report.

¶23. The jury found Mitchell guilty of second-degree murder. The trial court sentenced Mitchell to forty years in custody with ten years suspended. Mitchell appeals. He argues that the lack of an autopsy deprived him of his due process rights and his right to present a complete defense.

¶24. Because the record was missing any transcript of the hearing on Mitchell's motion to compel autopsy, and because it was also missing any preliminary autopsy report or other autopsy information that the State appeared to have in its possession, this Court ordered record supplementation and supplemental briefing. The Court directed that any transcript or recording of the autopsy motions hearing be filed, and if it could not be filed, "the Clerk of the Lowndes County Circuit Court is directed to file a statement describing the reasons thereto." The Court also ordered supplemental briefing "to address the impact of any transcript, or lack thereof, on the appeal. Supplemental briefing should also address whether the State made contradictory statements regarding the autopsy or lack thereof, and any impact on the appeal in this case." The trial judge responded by letter to this Court that the hearing was handled by phone conference, and no transcript was made. The parties then filed supplemental briefs.

## ANALYSIS

¶25. Because whether the trial court erred by failing to order an autopsy to assist with a complete defense is a due process argument, the largely legal questions should be reviewed

de novo.[1]  *Freeman v. State*, 121 So. 3d 888, 895 (Miss. 2013).

¶26.    Mitchell argues that he was denied a fair trial in violation of his due process rights due to various issues surrounding the autopsy.  Mitchell argues that the lack of autopsy or autopsy report harmed his ability to present a complete defense.  He maintains that he was not furnished with any sort of autopsy report or witnesses to an autopsy or partial autopsy, even though the evidence at trial, including indications at trial that drug tests were performed on Moore's body and that bullet fragments were removed from the body, indicated that at least a partial autopsy was performed.  Mitchell argues that not receiving this evidence or access to witnesses was damaging to his defense, particularly because no one testified about potential exculpatory evidence regarding how close the gun was when it was shot and regarding the influence of methamphetamines in Moore's system.  In the supplemental briefing, Mitchell argues that the lack of a hearing transcript mandates reversal, and that the contradictory statements by the State are not reconciled because of the lack of transcript; he maintains, therefore, the case should be reversed.

¶27.    The State argues that an autopsy is not necessary to establish the *corpus delicti* in a murder case.  *See* *King v. State*, 251 Miss. 161, 168 So. 2d 637, 643 (1964).  While that

---

[1]We note that this case implicates Mississippi Code Section 41-61-67(2), which provides that any person, in a civil, criminal, or other context, may petition the appropriate circuit court for an order of exhumation of a body.  Miss. Code Ann. § 41-61-67(2) (Rev. 2018).  This Court has never determined the general standard of review for an order granting or denying such a statutory request.  We do not do so today, because the issue in today's case is subsumed within a criminal defendant's due process arguments, which we review de novo.  We acknowledge that the Court of Appeals, in a case in which the petitioner for exhumation made a statutory (not constitutional), civil claim, reviewed the issue for abuse of discretion.  *Williams v. State*, 129 So. 3d 934, 936-37 (Miss. Ct. App. 2013).

assertion is correct, it addresses an issue that is not on appeal because Mitchell does not argue that the State failed to prove Moore's death, and he does not raise this as a sufficiency of the evidence issue. Rather, he argues that he needed an autopsy or autopsy report to be able to present a complete defense. This is essentially an evidence suppression or spoliation argument. *See* ***Russell v. State***, 849 So. 2d 95, 117 (Miss. 2003). And while the State argues that Mitchell waived certain specific issues such as the introduction of any toxicology report by failing to present them to the trial court, it does not address the overall substance of his complete defense argument. It also argues in supplemental briefing that Mitchell waived any error in the lack of a transcript of the hearing, that Mitchell cannot show prejudice, and that any contradictory statements do not warrant reversal because they did not so infect the trial as to result in the denial of a fair trial.

¶28.    In spoliation of evidence cases, the Court examines three factors to determine whether the defendant's due process rights have been violated. ***Freeman***, 121 So. 3d at 895. The three factors considered are:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Id.* (quoting ***State v. McGrone***, 798 So. 2d 519, 523 (Miss. 2001); ***Arizona v. Youngblood***, 488 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). This Court has recognized that, under certain factual circumstances, the claim need not fit perfectly into the three-part test to amount to a due process violation. ***Freeman***, 121 So. 3d at 895. However, in this

14

case, the record does not sufficiently indicate whether the evidence possessed apparent exculpatory value. The toxicology report was not placed in the record, and, indeed, it is unclear from the record exactly how the State had that information. It appears that a preliminary autopsy report may have existed, but if it did, it is not in the appellate record. No indication exists regarding what occurred between the time the State implied an autopsy was pending after Mitchell filed a motion to receive the report and to preserve his rights to access an autopsy report, and the time the State informed the trial court that the body had been buried without an autopsy. No preliminary notes from the medical examiner are in the record. In short, while the record indicates that several items adjacent to an autopsy exist, none of those documents or evidence are in the record to assist in the determination of whether any autopsy possessed exculpatory value. Additionally, while the State made some seemingly contradictory statements regarding an autopsy or autopsy documents that existed, the record is devoid of information regarding exactly what the State had and when it had it and what it understood about those documents. A determination regarding bad faith simply cannot be made upon the record as it stands.

¶29. Moreover, in cases in which portions of the record (including a transcript) are missing, a case may require reversal and remand for a new trial. *Watts v. State*, 717 So. 2d 314, 316-18 (Miss. 1998). However, when the defendant is represented by the same counsel on appeal as at trial, the defendant "is required to show specific prejudice by the missing portions of the record in order to mandate reversal and remand for a new trial." *Id.* at 318. Mitchell was represented by the same counsel at trial as on this appeal, and counsel does not attempt to re-

create the record of the hearing. Mitchell must therefore show specific prejudice due to the missing hearing transcript. Mitchell does not allege that anything occurred in that hearing that would change the course of what occurred, despite trial counsel having attended the hearing and knowing what occurred. He simply maintains that because the hearing transcript does not exist, certain alleged discrepancies such as the contradictory statements by the State cannot be clarified. Mitchell's arguments do not demonstrate specific prejudice. It is possible that Mitchell could show that the State misrepresented the autopsy documents available at this hearing given the State's contradictory statements at trial, but he would have to go outside the record in any such attempt.

¶30. In this case, the record indicates that documents from the medical examiner regarding Moore's body may exist, but none of those documents, if they do exist, are in the record before this Court. The record gives no indication whether any potentially problematic issues surrounding the autopsy actually rise to the level of a due process violation. Because the record as presented to this Court does not contain evidence that would support a due process violation, we must affirm Mitchell's conviction.

## CONCLUSION

¶31. The evidence in the record before this Court is insufficient to indicate that a due process violation occurred. Consequently, we affirm Mitchell's conviction for second-degree murder.

¶32. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**

16